JM:RB
F.#2010R00826

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- against -<br><br>ANTHONY VECCHIONE,<br>    also known as "Anthony Lanza"<br>    and "Andrew Goldman,"<br><br>               Defendant. | I N F O R M A T I O N<br><br>Cr. No. 10 Cr 697 (JBW)<br>(T. 18, U.S.C., §§ 371,<br>981(a)(1)(C), and 3551<br>et seq.; T. 21, U.S.C.,<br>§ 853(p); T. 28, U.S.C.,<br>§ 2461(c)) |

- - - - - - - - - - - - - - - - -X

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

I. Background

1. Gryphon Holdings Inc., which also did business under the name Gryphon Financial (hereinafter, collectively, "Gryphon"), was a Staten Island-based company that provided customers with investment advisory services.

2. The defendant ANTHONY VECCHIONE, also known as "Anthony Lanza" and "Andrew Goldman," and others (collectively, the "conspirators") worked as sales representatives at Gryphon.

3. From in or about January 2007 to April 2010, the conspirators offered Gryphon customers subscriptions to "investment newsletters" in which Gryphon provided customers with

specific trade recommendations. These subscriptions ranged in price from $99 to $1,000,000. As part of the subscriptions, customers also received direct telephone access to the conspirators.

4. In addition to the investment newsletter subscriptions, the conspirators also sold customers advice regarding individual stocks and options or groups of stocks and options. These recommendations ranged in price from $1,000 to $50,000.

5. The conspirators also frequently provided customers with investment advice that was supposedly tailored to the customers' individual circumstances. In some instances, the conspirators directly managed customers' investment accounts or money.

6. The coconspirator's trading recommendations frequently involved securities of issuers with a class of securities registered under section 12 of the Securities Exchange Act of 1934.

7. Gryphon maintained a sophisticated website and paid for banner advertisements on other websites that directed customers to Gryphon's site. The Gryphon site encouraged potential customers to provide their contact information. Gryphon also purchased "sales leads" from other companies which

2

contained the names and contact information of potential customers. After Gryphon acquired an individual's contact information, that person received emails and telephone calls promoting Gryphon's services.

II. The Gryphon Scheme

8. Throughout the course of the company's existence, the conspirators used high-pressure sales tactics and a wide range of misrepresentations to convince potential customers to buy Gryphon's fee-based services. Once a customer purchased a service, the conspirators used the same tactics and misrepresentations to sell the customers increasingly expensive services. Over the course of the scheme, the conspirators defrauded Gryphon's customers of more than $20 million using these methods.

A. Gryphon's Fake Trading Desk

9. The conspirators and Gryphon's promotional materials regularly referred to the company's trading desk and touted its traders' long experience and unparalleled expertise. The conspirators typically referred to themselves as traders in their conversations with customers, and informed customers that they made the same trades Gryphon recommended to its customers, which claim also appeared in the company's promotional materials. In fact, Gryphon did not have a trading desk, and the

3

conspirators were not employed by Gryphon as traders.

B. Gryphon's Fake Hedge Fund

10. The conspirators and Gryphon's promotional materials also regularly referred to the company's hedge fund. For example, the website claimed that Gryphon's hedge fund began on January 1, 2007, contained holdings in excess of $1.4 billion, and that Gryphon itself was run by its hedge fund traders. In fact, Gryphon did not operate a hedge fund.

C. Gryphon's Fake Employees

11. The conspirators and Gryphon's promotional materials also touted the trading and investment prowess of Ken Maseka, who was purported to be, among other things, Gryphon's president, founding partner, owner and head trader. The conspirators described Maseka as a billionaire stock picker and trader who was educated at Harvard and Oxford and who worked as an executive at Goldman Sachs. The conspirators regularly referred to Maseka in their conversations with customers, sold certain "premium" services that included personal access to Maseka, and told customers that they were speaking with Maseka. In fact, Maseka did not exist. The name was an alias employed by one of Gryphon's owners, who was not a billionaire stock picker, did not attend Harvard or Oxford, and did not work at Goldman Sachs.

4

12. The conspirators and Gryphon's promotional materials also touted the trading and investment prowess of Michael Warren, who was purported to be, among other things, Gryphon's vice-president, partial owner, chief financial strategist, head of equity hedge fund strategies, and manager of the firm's offshore hedge fund and structured products division. The conspirators told Gryphon's customers that Warren was a graduate of Columbia University and the Wharton School of Business. As with Ken Maseka, the conspirators referred to Warren in conversations with customers, sold "premium" services that offered direct access to Warren, and told customers that they were speaking with Warren. In fact, Warren did not exist. The name was another alias used by the same owner of Gryphon, and the Warren life story, like the Maseka life story, was fictional.

13. The conspirators and Gryphon's promotional materials also touted the investment and trading prowess of a number of other fake employees, who also possessed detailed, false life stories. Many of the conspirators used such fake names and identities in their communications with customers.

D. False Testimonials

14. The conspirators and Gryphon's promotional materials presented customers with false testimonials concerning Gryphon's trading prowess. For example, Gryphon's promotional

5

materials stated that the famous financier George Soros said, "Alone the traders of Gryphon Financial are incredible, together the[y] are unstoppable."

E.  False Addresses

15. The conspirators and Gryphon's promotional materials claimed that the firm operated from a Wall Street office. In fact, Gryphon operated in a commercial space located in a strip mall on Staten Island and paid for the use of a "virtual address" on Wall Street.

16. The conspirators and Gryphon's promotional materials also claimed that the firm had working offices in Chicago, London, England and Sydney, Australia. In fact, no Gryphon employees worked from such offices.

F.  False History

17. The conspirators and Gryphon's promotional materials also referred to the firm operating as of 1991, among other false dates. In fact, the company first filed for status as a corporation in New York in March 2006.

G.  Fake Research

18. The conspirators routinely informed customers that the company's trade recommendations were the result of the work of scores of talented financial analysts and researchers who worked for Gryphon. In fact, Gryphon did not employ such people.

H.  False Sales Pitches

19.  The conspirators made false statements to Gryphon's customers to explain why their trading recommendations — which would only be disclosed if the customer bought the service being pitched — were poised to provide exceptional profits.  For example, the conspirators routinely informed customers that Ken Maseka and Michael Warren were at that very moment meeting with powerful individuals concerning an upcoming transaction and that the last time these individuals met, Warren and Maseka came away with a trade position that produced staggering profits.

20.  The conspirators employed a wide range of other misrepresentations to gain their customers' trust concerning their trading positions, ranging from fraudulent statements concerning their past trading success to claims that the coconspirator speaking to the customer had himself or herself placed large amounts of his or her own or a family member's money behind a certain trade.

## INVESTMENT ADVISOR FRAUD CONSPIRACY

21.  The allegations contained in paragraphs 1 through 20 are repeated and incorporated as though fully set forth in this paragraph.

22.  In or about and between January 2007 and April 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ANTHONY VECCHIONE, also known as "Anthony Lanza" and "Andrew Goldman," together with others, did knowingly and willfully conspire to use the mails and means and instrumentalities of interstate commerce, directly and indirectly, to employ a device, scheme and artifice to defraud clients and prospective clients, contrary to Title 15, United States Code, Sections 80b-2(11), 80b-6 and 80b-17.

23.  In furtherance of the conspiracy and to effect its objectives, within the Eastern District of New York and elsewhere, the defendant ANTHONY VECCHIONE, also known as "Anthony Lanza" and "Andrew Goldman," together with others, committed and caused to be committed, among others, the following:

### OVERT ACT

(a)  In or about October 2009, the defendant ANTHONY VECCHIONE spoke on the telephone with Customer #1, an individual whose identity is known to the United States Attorney.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

8

## CRIMINAL FORFEITURE ALLEGATION

24. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged in this Information, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), of any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of such offenses, and all property traceable to such property, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the offense.

25. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a)  cannot be located upon the exercise of due diligence;

    (b)  has been transferred or sold to, or deposited with, a third party;

    (c)  has been placed beyond the jurisdiction of the court;

    (d)  has been substantially diminished in value; or

    (e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeitable allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

 

_____
LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK